George C. JONES, Petitioner,

v.

Dr. Allen L. AULT et al., Director of the Georgia Board of Correction and Offender Rehabilitation and Members thereof, and Joe S. Hopper, Warden, Georgia State Prison, Reidsville, Georgia, Respondents (two cases).

Nos. CV474–279, CV474–293.

United States District Court,
S. D. Georgia,
Savannah Division.

Nov. 19, 1974.

Final Order Dec. 13, 1974.

George C. Jones, pro se.

## ORDER

LAWRENCE, Chief Judge.

Petitioner, an inmate at Georgia State Prison at Reidsville, seeks to file in forma pauperis a civil rights petition pursuant to 42 U.S.C. §§ 1983, 1985. Jones alleges that he is the subject and victim of a "Behavior Modification Program" conducted at the prison and that the "controlling system is a watchful eye of the State through electronic surveillance upon the human body . . . . ." He asserts that the surveillance system "combs" his body and "wantonly monitors and picks up sounds and voices, but is also tuned directly to plaintiff's brain".

Petitioner says that the "machine apparatus used to perfect such felonious and fierce acts perhaps consist in part; EEG, EKG, transmitters and other electric gadgets. Also, from these machines and electric transmitting devices comes an electric current (voltage unknown) that penetrates the complete body of plaintiff causing ill effects, itch, a heated chest, a heated abdomen, an attack upon the brain and heart which is severe pain and harassment to Plaintiff."

Petitioner seeks injunctive relief and $500,000 in damages from the defendants.

Jones claims that he is a "guinea pig" and that the behavior modification system is a violation of his First, Fourth, Fifth, Eighth and Fourteenth Amendment rights. He maintains that the State has "no right without any permission from plaintiff to probe his mind and body with electric current or parabolic sound waves".

This Court is intrigued by the alleged "Behavior Modification Program" at Reidsville and the machine or device by which such is accomplished. It must be conceded that a mechanism which can probe the human mind, monitor thoughts and achieve behavioral control over a person is not without significance. If it actually exists, the brain-scan machine would appear to represent a distinct advance over prior art in the field of extra-sensory perception.

I take it that petitioner is claiming that the prison authorities at Reidsville utilize a thought-control machine by which electronic or sonic waves are transmitted to his brain so as to produce behavioral modification. Quite possibly, the alleged device achieves control of one's behavior by concentrating electron-

ic impulses on that part of the brain known as the "thalamus"—a cerebral area believed by some medicopsychologists to influence or affect "adjustment to the environment" when externally stimulated by a means or mechanism adapted to that purpose. See Walker Percy, *Love in the Ruins* (Farrar, Straus & Giroux, New York, 1971), p. 27.

It is claimed that the machine is also capable of reading minds. I gather that psycho-retrieval is accomplished by electronic waves being transmitted to the inmate's cerebellum where they "listen" to the micro-thought impulses generated by the process of mentation. The machine then transmits such impulses to a parabolic reflector in the prison where the innermost thoughts of inmates are decoded by some process with which this Court lacks familiarity.[1] We must not be too precipitate in disbelieving and discrediting scientific miracles. It was, I believe, the celebrated Harvard astronomer, Simon Newcomb, who at the time the Wright Brothers were tinkering with their flying contraption, pontificated thusly:

"The demonstration that no possible combination of known substances, known forms of machinery, and known forms of force can be united in a practical machine by which man shall fly long distances through the air, seems to the writer as complete as is possible for a demonstration of any physical fact to be."

The meliorative possibilities of such a device for the benefit of humanity are considerable if it stays in proper hands. However, petitioner thinks that it is in bad hands.[2] He alleges that his thoughts are read and his behavior controlled without his consent and in violation of his First Amendment right of free thinking and his Fourth Amendment guarantee against unreasonable search and seizure.[3] This Court perceives a distinction between mass thinking achieved by the media, on the one hand, and the surreptitious control of thinking, on the other hand, by the use of electronic apparatus.

It would seem that a machine that represents a major breakthrough in metaphysics would have been patented in the United States Patent Office. Apparently, it has not been.[4] This and other factors create reservations and doubts in the Court's mind as to granting relief to plaintiff at this stage.

1. I am not unfamiliar with the general subject of remote control over the mind. It came to my notice a year ago when a petition was filed by an inmate of a federal prison who alleged that the Parole Board employed electronic sensory eavesdropping and brain recording equipment to produce in him a state of "moronism". See Boyce v. United States Parole Board, (S.D., Ga., C.A. 3224, 11/16/75).

2. Such was the fate that befell the "lapsometer", a super-sophisticated stethoscope of the human spirit, capable of making readings in pinheaded areas of the brain and of fathoming, measuring and treating hidden anxieties, depressions, inner conflict and lusts. See Percy, *Love in the Ruins*, op. cit., *passim*.

3. The Fourth Amendment contention raises the questions of whether thought interception by means of electronic brain-scanning is a search or seizure of one's person and whether or not thoughts by themselves constitute "effects" within the meaning of such constitutional provision. Government eavesdropping by recording a person's oral statements represents a "search and seizure". Katz v. United States, 389 U.S. 347, 88 S.Ct. 507, 19 L.Ed. 2d 576. Is the fact that one's thoughts, rather than spoken or written words, are intercepted significant? And what of the effect of the recognized right of prison authorities to subject inmates to intense surveillance and search without the necessity of obtaining warrants. See People v. Hernandez, 229 Cal. App.2d 143, 40 Cal.Rptr. 100, 229 cert. den. 381 U.S. 953, 85 S.Ct. 1810, 14 L.Ed. 725. Perhaps, however, these speculations about the Fourth Amendment contention possess a degree of idleness at this stage.

4. This Court is not unaware that prison authorities utilizing thought control machines are unlikely to reveal the existence or operation of so revolutionary a device.

■ *Pro se* complaints filed by prisoners should not be dismissed without the opportunity to present evidence since a "less stringent" standard than that of "formal pleadings drafted by lawyers" is applicable in such cases. See Haines v. Kerner, 404 U.S. 519, 520, 92 S.Ct. 594, 30 L.Ed.2d 652; Williams v. Halperin, 360 F.Supp. 554 (S.D., N.Y.). Such a pleading "must be carefully and sympathetically examined to ascertain the existence of any basis for recovery". Rimka v. Fayette County Board of Commissioners, D.C., 360 F.Supp. 1263, 1264. However, broad and conclusory statements unsupported by factual allegations are insufficient to support a cause of action under § 1983. Fletcher v. Hook, 446 F.2d 14 (3rd Cir.); Guedry v. Ford, 431 F.2d 660 (5th Cir.); Finley v. Rittenhouse, 416 F.2d 1186 (9th Cir.); Hanna v. Home Insurance Company, 281 F.2d 298 (5th Cir.); Kitchen v. Crawford, 326 F.Supp. 1255 (N.D., Ga.); Post v. Payton, 323 F.Supp. 799 (E.D., N.Y.); Weise v. Reisner, 318 F.Supp. 580, 583–584 (E.D., Wis.).

■■ A pauper's affidavit is not a broad highway into the federal courts in the case of prisoner petitions. The district judge may authorize commencement of a civil action without prepayment of fees and costs by a person who makes affidavit that he is unable to pay same. 28 U.S.C. § 1915. However, district courts possess wide discretion in denying a motion to proceed as a pauper where the complaint is frivolous. See Boag v. Boies, 455 F.2d 467 (9th Cir.), cert. den. 408 U.S. 926, 92 S.Ct. 2509, 33 L.Ed.2d 338; Conway v. Fugge, 439 F.2d 1397 (9th Cir.). Patent lack of merit in the claim or want of realistic chances of ultimate success warrants dismissal or refusal to allow a complaint to be filed by an indigent prisoner. Jones v. Bales, 58 F.R.D. 453 (N.D., Ga.), aff'd. 480 F.2d 805 (5th Cir.); Urbano v. Sondern, 41 F.R.D. 355 (D.,

Conn.), aff'd. 370 F.2d 13 (2nd Cir.), cert. den. 386 U.S. 1034, 87 S.Ct. 1485, 18 L.Ed.2d 596.

Accompanying Jones' papers is a motion to subpoena certain witnesses. Petitioner says that they must be examined by him since otherwise "he is unable to prove his contentions", viz. that his life is in danger due to "parabolic sonic waves or some strange current effecting his physical body and vital parts thereof". Petitioner lists eight prospective witnesses. All of them except Warden Hopper reside at Atlanta or elsewhere than Reidsville. Petitioner also moves for production of various prison records for the purpose of inspection.

■■ The application for discovery by oral depositions and for inspection is premature. The liminal question is whether petitioner has a right to proceed *in forma pauperis*. This Court has decided to require further showing by Mr. Jones. He is not entitled to file his complaint as an indigent on the theory that he may later develop his claims during the progress of discovery procedures. Petitioner will respond in writing, under oath, to the following inquiries:

Has he or any present inmate of the Georgia State Prison seen the machine or device described?

If not, on what facts and evidence does petitioner's claim rest as to the existence and operation of such electronic device?

Upon what specific evidence does petitioner rely to sustain his contention as to the use by the Georgia Prison authorities at Reidsville of a machine that probes his mind; collects thought data, and controls or modifies his behavior?

What specific evidence or facts, other than petitioner's say-so or his own conclusions and opinions, are relied on to support his claim that certain physical

ills resulted from exposure to electrical or sonic waves transmitted by the machine referred to?

Describe the changes and modifications in the behaviorism or personality of petitioner as a result of the use of the machine or device.

Petitioner will file responses to the foregoing questions under oath on or before December 8, 1974. Decision as to allowance of the filing of the complaint *in forma pauperis* will be withheld pending receipt of the further information required of petitioner.

## FINAL ORDER

Plaintiff has responded to the several queries addressed to him in the Order of this Court dated November 19th. The questions sought to ascertain the basis in fact rather than mere conclusions as to use at Georgia State Prison of a machine or device by which Jones' brain is probed and monitored by electric or parabolic sound waves designed to achieve behavioral control.

Claiming violation of his constitutional rights as to freedom of thought and against unreasonable search and seizure, cruel and unusual punishment and deprivation of due process, plaintiff sues for damages pursuant to 42 U.S.C. § 1983.[1]

In petitioner's answer to the questions propounded by the Court, he admits that he has not seen the machine nor has any other inmate, to his knowledge. "But we know that they exist by the powers of perfection." Jones says that cross-examination of "Behavioral Biologists" and psychiatrists is necessary in order to prove that he is being subjected to a Behavior Modification Program by use of "parabolic waves or a strange alien current or radiation waves". Plaintiff informs the Court that the device may be located at Reidsville but that the "most likely place" at which the electronic machines are set up is at the Central State Hospital at Milledgeville.

The waves particularly attack the pituitary gland which, petitioner says, is the most important portion of the "emotional brain". However, they are directed at various other parts of his body, causing such symptoms as itch between the legs and his private parts and in the rectal area; hunger after eating; sleeplessness; sexual self-excitation; loss of memory; sluggishness; depression; paranoia; fire in the stomach and chest; migraine, et cetera.

Plaintiff alludes to the development of sophisticated electronic devices which are capable of picking up whispers in a room and broadcasting them to a receiver a half block away. I am cognizant of modern developments in that field. Indeed, space-age, microminiaturized electronic gadgets make it possible to attach radio receivers to experimental animals with implanted electrodes being activated by remote control so that selected regions of the hypothalmus may be electrically stimulated to produce aggressive or submissive behavior as well as sexual and appetitive responses in animals.[2]

---

1. After this Court's first Order, an identical complaint filed by Jones in the Northern District of Georgia was transferred to this jurisdiction for convenience of parties and witnesses. That action is consolidated with the case now before this Court.

2. C.U.M. Smith, *The Brain, Towards an Understanding* (Putnam Sons, New York, 1970), 236–239, 244–245. "The implantation of electrodes in order to control [animal] behaviour has become a common technique . . . Among the specific behaviour patterns that have been evoked by electrical stimulation at different sites in the brain are eating, drinking and fighting." Keith Oatley, *Brain Mechanisms and Mind* (E. P. Dutton, New York, 1972), 127. The technical papers and studies cited by thse two authors include: J.M.R. Delagado, "Free behaviour and brain stimulation", 6 *International Review of Neurobiology* (1964), 349–449; P.

This experimentation in stimulating appropriate regions of the brain stem to produce behaviorial response in animals is notable. So are the modern advances in electroencephalography (EEG).[3] But compared with the Behavior Modification device at Reidsville the development referred to represent the difference between a roman candle and Pioneer XI. The point is not the infinitesimally minute possibility that electropsychological science has developed to the stage of reading and controlling the human mind through electronic or sonic waves. The point here is that the claim of the existence of a machine capable of achieving such fantastic results is supported by the merest speculation, surmise or ipse dixitism. A court is under no duty to permit an indigent defendant to examine witnesses, at public expense, in order to attempt to prove facts improbable to the nth degree.

"A pauper's affidavit is not," as stated in the first Order, "a broad highway into the federal courts in the case of prisoners' petitions". Under 28 U.S.C. § 1915, district courts possess wide discretion as to denying motions to proceed as a pauper in cases where a complaint is frivolous or where there is patent lack of merit and want of realistic chances of ultimate success.[4] Broad and conclusory allegations are insufficient to support a cause of action under § 1983.[5]

Accordingly, the complaint brought in this jurisdiction is dismissed and will be filed for record purposes only. The action transferred to the Southern District is also dismissed.

---

Milner, *Physiological Psychology* (New York, 1970); R. Thompson, *Foundations of Physiological Psychology* (New York, 1967); W. W. Roberts and E. H. Bergquist, "Attack elicited by hypothalamic stimulation in cats . . .", 66 *Journal of Comparative Physiological Psychology* (1968) 590–598.

3. "The recording of the electric currents developed in the brain, by means of electrodes applied to the scalp, to the surface of the brain, . . . or placed within the substance of the brain." See *Dollard's Illustrated Medical Dictionary*, 24th ed., 1965.

4. Boag v. Boies, 455 F.2d 467 (9th Cir.), cert. den. 408 U.S. 926, 92 S.Ct. 2509, 33

L.Ed.2d 338; Conway v. Fugge, 439 F.2d 1397 (9th Cir.); Jones v. Bales, 58 F.R.D. 453 (N.D., Ga.), aff'd. 480 F.2d 805 (5th Cir.); Urbano v. Sondern, 41 F.R.D. 355 (D., Conn.), aff'd. 370 F.2d 13 (2nd Cir.), cert. den. 386 U.S. 1034, 87 S.Ct. 1485, 18 L.Ed. 2d 596.

5. Fletcher v. Hook, 446 F.2d 14 (3rd Cir.); Guedry v. Ford, 431 F.2d 660 (5th Cir.); Finley v. Rittenhouse, 416 F.2d 1196 (9th Cir.); Hanna v. Home Insurance Company, 281 F.2d 298 (5th Cir.); Kitchen v. Crawford, 326 F.Supp. 1255 (N.D., Ga.); Post v. Payton, 323 F.Supp. 799 (E.D., N.Y.); Weise v. Reisner, 318 F.Supp. 580, 583–584 (E.D., Wis.).